### In re NEELY.

#### (District Court, S. D. New York. August 5, 1904.)

1. BANKRUPTCY—DISCHARGE—STATUTES—AMENDMENT.

Bankr. Act July 1, 1898, § 14 (30 Stat. 550, c. 541 [U. S. Comp. St. 1901; p. 3427]), as amended by Act Feb. 5, 1903, § 4, subd. 5 (32 Stat. 797, c. 487 [U. S. Comp. St. Supp. 1903, p. 411]), providing that a bankrupt's discharge shall be denied if the bankrupt in voluntary proceedings has been granted a discharge in bankruptcy within six years, is not retroactive, but applies to cases begun after amendment took effect.

2. SAME—PREVIOUS DISCHARGE IN VOLUNTARY PROCEEDINGS.

Bankr. Act July 1, 1898, § 14 (30 Stat. 550, c. 541 [U. S. Comp. St. 1901, p. 3427]), as amended by Act Feb. 5, 1903, § 4, subd. 5 (32 Stat. 797, c. 487 [U. S. Comp. St. Supp. 1903, p. 411]), provides for a bankrupt's discharge unless he has in involuntary proceedings been granted a discharge in bankruptcy within six years. *Held*, that such amendment applied to voluntary as well as involuntary proceedings, and that a bankrupt having been discharged in voluntary proceedings within six years could not receive a second discharge in involuntary proceedings.

3. SAME—DEEDS—ASSETS—FAILURE TO SCHEDULE—INTENT—FRAUD—EVIDENCE.

Where a bankrupt failed to schedule a piece of real estate of small and uncertain value, and under the advice of his attorney omitted from his schedules a debt which was a family affair and never intended to be enforced, such acts were insufficient to justify a finding of fraudulent concealment warranting the withholding of a discharge.

## On Hearing of Application for a Discharge.

The following opinion of Special Commissioner Dexter states the case:

The issues on specifications of the grounds of objection to the bankrupt's discharge having been referred to me as special commissioner to ascertain and report the facts, and the respective counsel for the bankrupt and the objecting creditors having appeared before me on due notice, and the proofs offered by them respectively having been heard and considered, and a copy of the testimony returned herewith, and the matter having been submitted by George C. Coffin, Esq., attorney for the bankrupt, and by Henry S. Sanford, Esq., attorney for the objecting creditor, and due deliberation having been had, I hereby report that the facts relevant to the objections are as follows:

On July 28, 1903, upon the petition of three creditors, Frank Tennyson Neely was adjudicated an involuntary bankrupt in this proceeding, he consenting thereto. On August 24, 1903, he filed his schedules, showing a total indebtedness of $12,481.12, and assets claimed to be of the total value of $8,527.63. At the first meeting of creditors Mr. Marshall S. Hagar was appointed trustee, and the bankrupt fully examined. On September 28, 1903, the bankrupt was granted leave to file an amended schedule, setting forth, among his liabilities, a judgment for $111.90 obtained by one Walker, and a certain claim alleged to be due Hurlburt, Hatch & Co. on a stock transaction. No further amendments were applied for.

The examination developed the fact that the bankrupt had been previously discharged in voluntary proceedings (No. 1,608), petition filed October 21, 1899; discharge granted February 4, 1901. The trustees appointed in the previous proceeding were discharged by order of Mr. Referee Wise, August 22, 1902. Specifications in opposition to the bankrupt's discharge were filed on behalf of William T. Hallett and the Stanley Works, respectively, which in substance oppose the discharge: (1) On the ground that the bankrupt had been granted a discharge in voluntary proceedings within six years; (2) charging sundry false oaths with reference to his failure to schedule an indebtedness to one Mary R. Cooke, and an interest in certain Nebraska real estate, and fraudulent concealment with reference to said property.

The first ground presents an issue of law, which will be considered before proceeding to discuss the remaining specifications, which rest upon questions of fact. The first-mentioned specification is as follows: "II. That such application should not be granted because of the following facts constituting an additional ground, which the undersigned, on information and belief, charges to be true, viz.: That on or about the 21st day of October, 1899, said Frank Tennyson Neely was, upon his voluntary petition filed in this court, duly adjudged a bankrupt; and that thereafter, and on the 29th day of January, 1901, said Frank Tennyson Neely was granted a discharge in said proceedings by this court; and that thereafter, and on or about the 16th day of July, 1903, said Frank Tennyson Neely caused to be filed a petition in bankruptcy against him; and thereafter, and on the 28th day of July, 1903, said Frank Tennyson Neely consented to be adjudged a bankrupt; and thereafter, and on or about the 18th day of November, 1903, and within six years since his previous discharge in bankruptcy, said Frank Tennyson Neely presented to this court a petition praying for a discharge from his debts in the above-entitled proceeding, contrary to provisions of section 14, subdivision 'b,' of the act of Congress in relation to bankruptcy."

Assuming the facts to be as stated in the specification, the interesting point is raised by the bankrupt that the specification is insufficient in law to defeat the discharge, for the reason that the amendatory act of February 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1903, p. 409], (1) is not retroactive in respect to any of the added subdivisions of section 14 (32 Stat. 797 [U. S. Comp. St. Supp. 1903, p. 411]); and (2) in any event has no application to an involuntary proceeding.

So far as my examination goes, the questions involved have not as yet received judicial construction, and the subject must be considered as a case of first impression.

(1) Are the amendments to section 14 retroactive? It is a settled principle that no act of a bankrupt committed prior to the bankruptcy law is available as an objection to his discharge. Hence the decisions, both under the act of 1867 and the act of 1898, agree that such offenses as the concealment of books or assets prior to the enactment of the bankruptcy law cannot bar a discharge. In re Webb, 3 Am. Bankr. R. 386, 98 Fed. 404; In re Shorer, 2 Am. Bankr. R. 165, 96 Fed. 90; In re Lieber, 3 Am. Bankr. R. 217; In re Moore, Fed. Cas. No. 9,751; In re Hollenshade, Fed. Cas. No. 6,610; In re Delavan, Fed. Cas. No. 3,758.

The concealment of assets is made an offense punishable by imprisonment under section 29 (Act July 1, 1898, c. 541, 30 Stat. 554 [U. S. Comp. St. 1901, p. 3433]), and is necessarily limited to acts committed subsequent to the act. The destruction or concealment of books must have been "in contemplation of bankruptcy"; a false oath must have been in relation to "a proceeding in bankruptcy." By the letter and spirit of the act nothing could be made an offense or objection to a discharge which took place prior to the passage of the act. Furthermore, discharge proceedings are quasi criminal, in the strict construction placed on them, and the reluctance of the courts to refuse a discharge (except upon a clear preponderance of evidence) which may result in convicting the bankrupt of a crime. In all such cases the courts have very properly held that no retroactive effect can be given to the discharge features of the law.

But the reasoning does not apply with the same force to an amendment creating a new ground of objection to a discharge, for a bankruptcy law is already in existence, and the amendments are engrafted upon an existing statute. Restrictions upon discharge affect the remedy only. The right to a discharge is not an absolute vested right. It was not originally a feature of bankruptcy legislation either in this country or in England. The fundamental element in every system of bankruptcy has been to provide for and regulate the distribution of the bankrupt's property equally among his creditors. Originally this was its only purpose, and it was confined to traders as a purely commercial regulation. Latterly a second element was added in the provisions for discharge upon such terms and conditions as the act may provide. In re Gutwillig, 1 Am. Bankr. R. 78, 90 Fed. 475. There is therefore no constitutional right to a discharge, and regulations concerning discharge do not make the law unconstitutional. Hanover National Bank v. Moyses, 186 U. S. 181, 22 Sup. Ct. 857, 46 L. Ed. 1113, 8 Am. Bankr. R. 1. Under the act of 1867, as amended by the act of June 22, 1874, it was held that the new section 9 (Rev. St. U. S. § 5112a), relieving involuntary bankrupts from the conditions affecting other discharges, was not retrospective in the legal sense, and applied to pending cases. In Re Griffiths, Fed. Cas. No. 5,825, Judge Lowell says: "A law which discharges debts already contracted may well be called retroactive; and this law, if retroactive at all, would be not merely as to cases begun, but as to contracts entered into before its passing. But it is well settled that a mere modification of the condition upon which a discharge shall be granted to bankrupts is not retroactive." He refers approvingly to the language of Wilde, J., in Re Lane, 3 Metc. (Mass.) 213, where the learned judge states, construing the Massachusetts insolvency act: "It is clear that the appellant had no vested right to a discharge at the time of filing his petition. Such a right could be acquired only by proving, at the time of applying for a certificate of discharge, that he had in all respects complied with statutes 1838 and 1841 (the latter of which was passed after he had been adjudged an insolvent), by which only a right could be acquired. The latter statute, therefore, is not to be considered a retrospective act, disturbing vested rights, but as altogether prospective in its operation, although it (the discharge) might depend, in some cases, upon acts done before it took effect." Judge Lowell further states: "This law neither creates new frauds nor relieves the bankrupt from the consequences of any which he has committed, but merely lightens somewhat the arbitrary conditions before imposed on honest bankrupts as a preliminary to obtaining a certificate. Such a law is always held to be remedial." In Re King, Fed. Cas. No. 7,781, Miller, Circuit Judge, stated: "I think the general rule is that such remedial provisions do apply to pending cases, unless there is something to show that the Legislature intended to exclude them, and I can discover no such intention in the ninth section, or any part of the act of 1874."

The decisions under the amendatory act of 1874 are not uniform, and are of uncertain authority perhaps. But the reasoning upon which they are based seems to warrant the conclusion that, if an amendatory law is silent as to its effect, it, generally speaking, affects all pending proceedings, and that the restrictions and conditions upon which discharges may be granted are remedial only. By section 19 of the amendatory act of 1903 (Act Feb. 5, 1903, c. 487, 32 Stat. 801), its provisions are expressly stated as not applying to existing cases. If Congress can change the conditions with respect to discharges, and make them applicable to pending cases, a fortiori there can be no question of retroactive legislation in regard to cases begun since the amendment of February 5, 1903, as in the case at bar. I am therefore of the opinion that the amendment contained in subdivision 5 of section 14b is not objectionable on the ground that it is retroactive legislation.

(2) Is the amendment in question applicable to subsequent involuntary proceedings? Here, again, I find no adjudicated case. Mr. Referee Hotchkiss, in the fourth edition of Collier on Bankruptcy (page 174), states that "as originally drafted it referred to both voluntary and involuntary bankruptcy. The Senate, however, so modified it that this objection is available only to creditors of voluntary bankrupts." But Mr. Brandenburg states

with less ambiguity in his work on Bankruptcy, third edition (section 371):. "The fact that the bankrupt has been adjudged a voluntary bankrupt will not prevent involuntary proceedings from being instituted at any time, though the discharge on the involuntary petition would not be granted within the six years. The purpose of the act is simply to prevent the frequent filing of voluntary petitions."

Mr. Hotchkiss would seem inclined to the view that creditors of involuntary bankrupts cannot raise the objection of prior. discharge, while Mr. Brandenburg confidently asserts that discharges in involuntary proceedings. cannot be granted within six years after a discharge once granted in a voluntary proceeding. With such diversity of opinion on the part of recognized experts, I approach the subject with much diffidence as to the value of the conclusions which I have reached.

The history of the amendment may be instructive. The "Ray Bill," so called, incorporated certain amendments recommended by the referees in bankruptcy, and as originally drawn provided that a second discharge be refused in all cases where a previous discharge had been granted within six years. The amendment proposed was: "Sec. 14b. *. * * Or (7) been granted a discharge in bankruptcy within six years." Amended by the Senate, the act as passed was made to read: "Or (5) in voluntary proceedings been granted a discharge in bankruptcy within six years." The only ambiguity of construction lies in the relation of the words "in voluntary proceedings." On the one hand, it is contended that if the first proceeding is voluntary a second discharge must be denied, whether the second proceeding is voluntary or involuntary. If such is the law, this bankrupt's. petition must be denied. On the other hand, the learned counsel for the bankrupt argues with much force that the intention of Congress was merely to prevent the mischief of repeated voluntary bankruptcies on the part of failing debtors, and that this reason for the amendment does not exist in cases of involuntary bankruptcies, where the creditors and not the bankrupt are responsible for initiating the proceedings, and they cannot, on equitable principles, be heard to object to an application for a discharge which they themselves made necessary. The learned counsel calls attention to the use of the plural "proceedings" as necessarily referring to two proceedings, both of them voluntary.

Upon questions of construction reference to the provisions of the former act are often enlightening. Under the act of 1867 (section 30) no person who shall have been discharged, and shall afterwards become bankrupt on his own application, shall be again entitled to a discharge whose estate is insufficient to pay 70 per cent., without the assent of three-fourths in value of his creditors. This was amended by section 33 (as amended by act of July 27, 1868), which provided that no discharge shall be granted to a debtor whose assets do not pay 50 per cent. without the assent of a majority of his creditors. By section 9 of the act of June 22, 1874, a new section was added (Rev. St. § 5112a), providing that in cases of involuntary bankruptcy the provisions of the act requiring the payment of any proportion of the debts or the assent of any portion of the creditors as a condition of discharge shall not apply. There can be no doubt that it was the intention of the act of 1867 that involuntary bankrupts were excepted from the restrictions placed upon voluntary bankrupts. But does the same intention appear in the present act?

The amendatory act of 1903 is silent where the acts of 1867 and 1874 were explicit. It is a familiar canon of construction that language will not be given a forced or extended meaning merely to correct supposed errors, or because it leads to incongruous or unexpected results. People, &c., v. North, 72 N. Y. 124, 133; Tompkins v. Hunter, 149 N. Y. 123, 43 N. E. 532. Language is to be interpreted according to its natural and most obvious import. McCluskey v. Cromwell, 11 N. Y. 593. Such construction only will be departed from to avoid manifest absurdity, or to reconcile it with an unquestionable intent appearing elsewhere in the statute. People, &c., v.. Wemple, 115 N. Y. 307, 22 N. E. 272.

There can therefore be no deductions from the policy of the former act, unless the language of the present amendment indicates similar intent. If

Congress had intended to exempt involuntary bankrupts from the restriction as to a prior discharge in voluntary proceedings, it could have used language clearly indicating such purpose. It seems to me a forced construction of language to argue from the use of the plural "proceedings" an intent to qualify the words "discharge the applicant" in section 14b so that it should read: "In voluntary proceedings, discharge the applicant unless he had in voluntary proceedings been granted a discharge." Such an interpolation would, strictly speaking, prevent the granting of discharges in involuntary cases at all. Rather must we construe the amendment in its natural sense and in its natural collocation. The use of the plural "proceedings" is without significance, as the singular and plural of the word are used interchangeably in the act, and the canons of construction in section 1 (subdivisions 29, 30) negative any presumptions from the use of the singular or plural numbers.

The collocation of the words "in voluntary proceedings" naturally qualifies what follows, rather than what precedes. Read in this light, the section, so far as applicable to the case at bar, declares: "(b) The judge shall hear the application for a discharge * * * and discharge the applicant unless he has (5) in voluntary proceedings been granted a discharge in bankruptcy within six years." He may have been discharged in involuntary proceedings more than once; but that would not prevent his discharge in subsequent proceedings, voluntary or involuntary, if otherwise entitled thereto. But having once been granted a discharge in proceedings instituted by himself, and to serve his own purposes, he precludes himself from again seeking the benefit of a discharge in voluntary or involuntary proceedings for a period of six years.

It has been already pointed out that the right to a discharge is not a vested right. It is a mere privilege granted to the bankrupt under certain conditions, which Congress may alter from time to time, or Congress may even entirely deprive the bankrupt of the right to a discharge without violence to its constitutional powers over bankruptcies. The justice or injustice of doing so is for legislative consideration, and not for judicial comment. The inconsistency of allowing repeated discharges in involuntary proceedings, while restricting them in voluntary proceedings, is no greater than the restrictions which except certain classes of persons from the involuntary features of the act. It is the declared policy of Congress and within its constitutional powers. What was probably aimed at was a check on the repeated filing of voluntary petitions, which still constitute by far the larger number of bankruptcy proceedings. Once discharged on his own petition, a bankrupt cannot again obtain a discharge for a period of six years.

The law prevents his discharge, even if the proceedings are involuntary, for it will not allow that to be done by indirection which cannot lawfully be done directly; otherwise it would be a simple expedient for the bankrupt to act in such a way as to force his creditors to put him into a bankruptcy a second time, or to collusively procure their co-operation for that purpose, and thus evade the plain terms of the statute. I therefore report and recommend that the second specification is sustained, and the bankrupt's discharge should be refused.

The remaining specifications can be briefly disposed of. In 1885 the bankrupt, then a resident of Chicago, bought of John R. Kennedy three town lots in the town of Alma, Harlan county, Neb., described as Nos. 11 and 12, in block 15, in Brown's addition, and 14 in block 10, in original town of Alma, for an expressed consideration of $350, but for which the bankrupt testified that he gave the owner a finger ring, value not stated. He sold lots 11 and 12 in 1887 for $250, but the record title of No. 14 still remains in him, although he had supposed that he had sold this lot too. In 1890 the bankrupt purchased of Kennedy four additional lots in the same town, known as Nos. 13, 14, 15, and 16 in block 11, Brown's addition, the record title to which still remains in him. The consideration expressed is $1,350, but the bankrupt testifies that he gave the owner in exchange therefor a piano, value not stated. No reference to these lots appears in his schedules,

and this omission is claimed to constitute a false oath and fraudulent concealment.

In the previous bankruptcy proceedings (No. 1608) the four lots last mentioned were scheduled under Schedule B (1), real estate at an estimated value of $1,200. No mention was made of the remaining lot 14 in the original town of Alma, as he did not remember that he owned it. The property, however, was apparently considered of such slight value that it was not included in the inventory and report of the appraisers appointed in that proceeding, and no record or transfer was made to formally vest the record title in the trustees. Upon their discharge no mention was made of any real estate as undisposed of. The bankrupt retained or procured the return of the deeds, and considered himself revested with title; for he subsequently delivered the deeds to one Mary R. Cooke, as he testifies, "for money which I had borrowed in excess of the value of the lots." He further testifies: "A deed was to be executed when I could pay the taxes, * * * not knowing what the value of the property might actually have been at that time or that it might improve and become of value." No deed was in fact executed. He had borrowed from Mrs. Cooke some $700, but did not schedule the debt, as it was a personal transaction, not appearing on his books, and for the further reason that his relations to Mrs. Cooke were of a filial nature, and he considered the obligation a mere moral one, and not a legal debt. No claim therefor was filed by Mrs. Cooke. The bankrupt further claims to have disclosed this loan to his counsel, and to have been advised by him that under the circumstances it was unnecessary to refer to it in his schedules. The present value of the lots appears to be small—not exceeding $25 each, or $100 for all, and incumbered with taxes.

The conduct of the bankrupt in not disclosing this transaction is lacking in frankness, and his explanations not altogether satisfactory. But I cannot find from the circumstances that he concealed the property or made a false oath either knowingly or fraudulently. In regard to Mrs. Cooke's claim it was apparently a family affair, and never intended to be enforced. He disclosed the fact to his counsel, and acted on legal advice in omitting the claim from his schedules. Such advice tends to deprive the alleged false oath of its element of fraud. In re Berner, 4 Am. Bankr. R. 383; In re Blalock, 9 Am. Bankr. R. 266, 118 Fed. 679.

As to the Nebraska lots, the bankrupt did not, in fact, own the lots. The title, so far as appears, is still in the former trustees, and as soon as he was informed of the status of the lots he tendered the deeds to the trustee in the present proceeding, they having been surrendered by Mrs. Cooke. His disposal of the deeds is not consistent with his explanations that he did not consider that he owned the lots; but on considering the circumstances affecting the title, and their nominal value, I am not disposed to attach undue importance to this transaction.

In view of the conclusions I have reached upon the question of the prior discharge, I give the bankrupt the benefit of the doubt as to his intent in the above transaction. I therefore report that the specifications, other than that previously considered, are not sustained, but that, having received a discharge in a voluntary proceeding within six years, the present application should be denied.

George C. Coffin, for bankrupt.
Henry S. Sanford, for objecting creditor.

THOMAS, District Judge. Report confirmed.